## Baer *v.* Hemlinger, Appellant.

Argued October 2, 1963. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*George M. Weis*, with him *Weis & Weis*, for appellant.

*Harold R. Schmidt*, with him *Rose, Houston, Cooper and Schmidt*, for appellees.

*Frederick N. Egler*, with him *Reed and Egler*, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 12, 1963:

On the afternoon of October 24, 1957, John L. Baer, Jr. was driving his Studebaker sedan in an eastwardly direction on Route 30, east of the City of Pittsburgh. With him were his father and mother and his boy Brian. At the same time that this closely-knit group was enjoying its family spin, in complete harmony and contentment, two other motorists, Louis H. Hemlinger and Oliver Stitt, were engaged in a bitter vehicular quarrel on the same highway traveling in the opposite direction, that is westwardly. At a point about nine-tenths of a mile east of the Westinghouse Bridge, Stitt's

Chevrolet pickup truck and Hemlinger's Ford station wagon collided with one another slightly. It was ascertained later that the damage done to the Hemlinger station wagon amounted to a mere $40.* It would appear, however, that the touching of the cars provoked in Hemlinger an anger in inverse ratio to the slightness of the damage done his vehicle and when Stitt failed to stop, Hemlinger pursued him, blowing his horn and augmenting his speed, as Stitt, aware that he was being pursued, increased his speed also.

In a demonstration more in keeping with the Indianapolis Race Track than a suburban highway, these motorists raced one another reaching speeds of 70 miles an hour and ignoring traffic signals. As they roared over the Westinghouse Bridge, Hemlinger gained enough on Stitt to read his license plate number, but this apparently did not satisfy him, so he continued the pursuit. When they both got to a point about two-tenths of a mile beyond Center Street, Hemlinger put on an extra burst of speed, came abreast of his rival and then nosed ahead. Now he cut sharply into Stitt's path so as effectually to bar Stitt's passage and, to insure his being the undeclared winner of the race, Hemlinger straddled the two westbound lanes (this being a four-lane highway). By this time the racers had entered into a curve, and since Stitt was now trying to pass his speedier opponent, Hemlinger, in order to prevent that this should happen, swerved and, as another motorist who had witnessed this mad performance, testified: "The station wagon, well, more or less forced him [Stitt] into the oncoming traffic."

In this oncoming traffic was still another motorist, Paul E. Rathgeb driving a Plymouth white-and-red

---

* "It would seem that the lesser the damages in collisions of this kind the more apt the drivers are to enter into wordy warfare, each accusing the other of stupidity, gross carelessness and unflattering antecedents." *Neczypor v. Jacobs*, 403 Pa. 303.

convertible. Suddenly he saw a truck in his immediate orbit of travel heading toward him and apparently "going out of control." Turning to the girl who was accompanying him, he remarked not too casually, "Look at that fool!" The truck struck him head-on and catapulted his convertible into the air. When it descended, it came down on the Baer family in their automobile which John Baer had brought to a halt, wondering what was to happen when they beheld the unscheduled three-ring circus performance before their eyes. John Baer, describing the denouement of this highway drama, testified: ". . . That knocked his [Rathgeb's] car backwards up in the air, and his car was crossways of the way we had been traveling; and when it was up in the air, the door popped open and he flew out of it, fell down underneath the front end of my car, or somewhere down in that area. And his car, of course, was coming down out of the air with the door open, and, of course, in the meantime the truck went on past me, just missed me to my left, sliding sideways, and I heard Mr. Rathgeb's car slam down on top of mine, and just after that the crash of the truck and Nash convertible coming together behind me. Then my car was slammed down in front. Of course, that just caused his car to bounce forward some. Then Mr. Rathgeb, the next thing I recall him climbing up underneath the door of his car back up into the car. It was a convertible and the roof had apparently been torn loose or something, because it was down in the passenger compartment. He was struggling around in there and he finally managed to tear the top back and throw the back off the passenger compartment to help the girl out that was riding in the car."

Then Rathgeb, describing what happened to him, testified: "First, I looked at Miss Myers to make sure that she was all right, and we were both pretty scared. So I pushed the top up and helped her out of the car,

crawled over the seat and helped her out of the car, and then I looked at all the other cars. There was a horn blowing. So I looked around to see if anything could be done for anyone, and then I went back and sat down in the car and started to get a little faint." It could not be surprising that he would feel a "little faint."

Concluding his narrative, Rathgeb added, almost as an inconsequential detail: "I sat down, and my shoulder dropped out of place."

No matter how one views this case, it is incontrovertible that the Baers were innocent victims of a gasoline harlequinade. Even Stitt and Hemlinger admit this, but Hemlinger argues that he was innocent too.

The Baers sued Hemlinger, Stitt and Rathgeb. Hemlinger brought John L. Baer, Jr., driver of the Baer car, on the record as an additional defendant. The jury properly exonerated Rathgeb from all responsibility for the accident and found Hemlinger and Stitt liable for the damages suffered by the Baers, which they assessed as follows: John L. Baer, Sr. $14,-000, John L. Baer, Sr. on behalf of his wife $6,000, Virginia L. Baer $5,000, and John L. Baer, Jr. $3,000.

Hemlinger alone appealed and he asks that we enter judgment n.o.v. in his favor, asserting that "there was no evidence of negligence or continuing negligence" on his part "at the time of these collisions which could be found to be a legal cause thereof." Extraordinary as this statement must seem to be at first blush, Hemlinger does offer some rationalization in support of his contention. He says that even if it could be determined (which he does not admit) that he was the menace in the first act of this drama on Route 30, he had stepped out of the cast of players by the time the third act and the climax had been reached.

Hemlinger's attorney argues in his brief that Hemlinger "had a right to quit", and that he did quit be-

fore Stitt's truck struck Rathgeb's convertible, whose passengers and parts rained down on the Baer car. The question in this case can well be whether Hemlinger *had* the "right to quit," that is, legally.

According to Hemlinger's contention, a motorist who forces another car over a precipice can escape responsibility for what follows if he declares he has "quit" before the other car actually hits the bottom of the rocky defile. But the evidence leaves little doubt, verified as it is by the jury's verdict, that Hemlinger did not quit the fantastic enterprise, but was part of it until the final smashup. In pursuing the Stitt truck on a heavily trafficked boulevard, blocking his passage, and meteoring through red lights, Hemlinger's whole performance, prior to the actual crash between Stitt and Baer, made him as much a part of the final debacle as if it was his station wagon, instead of Rathgeb's convertible, which descended from above on to the immobilized Baer car with its human cargo.

Anyone who sets in motion a force whose momentum has not abated at the time of the eventual injury, can not claim immunity from responsibility from the effect. Hemlinger argues that "the action of Stitt amounted to an independent intervening cause of the ultimate injuries." The jury did not find Stitt's action to be an independent intervening cause, and well could they have so concluded. Hemlinger and Stitt were in effect two wheels of a motorcycle and could not be separated in responsibility one from the other for the harm their collective mad escapade visited upon the Baers. Throughout the entire course of action from the time of the original collision between Hemlinger and Stitt up to the time of the collision between Stitt and Rathgeb, there was not a moment that Hemlinger was not a potent agent in the cauldron of events that was building up to an explosion. To leave Hemlinger out of the story of what happened to the Baers,

and how it happened to them, would be like leaving Iago out of *Othello*.

The appellant complains that the Trial Judge in his charge to the jury indicated he believed the plaintiffs were entitled to a verdict. It would require a restraint almost beyond human control for any judge, and particularly the veteran jurist in this case, to refrain from voicing a view which so spontaneously springs to expression from the evidence as to the faultlessness of the plaintiffs and the damages they suffered as a result of the accident whose details the jurors listened to for three days. Even so, the Trial Judge emphasized to the jury that the mere fact an accident occurred did not entitle the plaintiffs to recover, nor could they expect a verdict unless negligence was proved. The Trial Judge said: "In the very first instance you must pass upon the question of the negligence of the defendant or defendants, as the case may be. You are first to determine was there any negligence on the part of Oliver Stitt or Mr. Hemlinger or Mr. Rathgeb on the day of this accident. Did the negligence of the defendants or any one of them or any of them collectively, cause this accident."

Further: "Now, that's the first thing to determine when you get into the jury room. If you say no to the question of negligence, that's the end of your deliberation and your verdict should be for the defendants. The question of causation is squarely before you for a determination from the evidence bearing in mind that the plaintiff cannot recover, even though he is not negligent, unless you find one of the defendants or both of them or all three of them negligent in this case."

The appellant contends also that the Trial Judge erred in his charge on concurrent negligence and proximate cause, arguing that Hemlinger could not be regarded negligent because whatever he did was not the proximate cause of the accident. Expatiating on this

point, counsel says: "There was no reason in the world why Stitt could not have crossed the road and caused this accident, even if Hemlinger's car was still in his garage." This argument is valid per se, but it treats the facts in this case rather penuriously. As an academic hypothesis it cannot be questioned that if Stitt were on the highway alone and Hemlinger's car was in the garage, Stitt could cross over without involving Hemlinger, but the evidence is startlingly vivid that Stitt had no desire of his own to cross the road except to avoid the avenging Hemlinger who was not in his garage but on the road wildly engaging in a vehicular vendetta which imperilled every car in the area.

The Trial Judge gave a correct definition of proximate cause and, contrary to what the appellant says, did explain the entire situation to the jury in such a manner that they could well recognize the difference between concurrent liability and concurrent cause. Did, therefore, Hemlinger's undoubted negligence throw Stitt into a situation from which he could not extricate himself so that his, Stitt's, car became an extension of Hemlinger's original negligence? The jury answered this question in the affirmative and the record justifies that finding. What this Court said in the case of *Rodgers v. Yellow Cab Co.,* 395 Pa. 412, could well be said of the Judge's charge here, namely, "Even though it be assumed arguendo that proximate cause was relevant . . . an examination of the court's charge in its entirety indicated that the jury were instructed that no verdict of negligence against any or all of the defendants could be rendered unless it were found that an act or omission to act on the part of them, or any of them, had caused and brought about this accident. The charge satisfied generally the requirement that negligence to be actionable shall have been the proximate cause of the accident . . . ."

Finally, the appellant complains that the verdicts were excessive. The evidence is to the contrary. John L. Baer, Sr. suffered injuries to his back, legs, elbow and upper dorsal spine when he was thrown against the windshield. He is required to wear a brace with a steel hinge. His knee gives him pain and he must constantly use hot baths, hot compresses and rubbing alcohol. Prior to the accident he worked at the Federal Laboratories where he taught the proper use of sub-machine guns, tear gas, alcometer, and so on. He had to give up this employment: "You can't teach the use of a sub-machine gun with one hand, and I had to have my cane. I couldn't throw so I couldn't teach the use of tear gas. I just wasn't active enough. That's all."

Mrs. Baer's neck was injured in the crash. She was hospitalized for several days and must use heating pads for her neck; she has "terrific headaches", which last sometimes two days and she must take pain killers for relief. She is no longer able to do her housework and must employ others who come to her home from once to three times a week. She pays these women $6 to $8 a day. John L. Baer, Jr. was crushed between the steering wheel and the back of the front seat at the time of the crash. His knee was injured and he has had to treat it with hot packs, hot compresses and heating pad. The damage to his car amounted to $1,089.15.

On the subject of damages, the Court below said: "The measure of damages was exclusively a question for the jury; and as we view it, the verdicts rendered were not so excessive as to shock the conscience of the Court." The record justifies that conclusion.

We approve the order of the court below denying the motions for judgment n.o.v. and a new trial.

Affirmed.